Filed 1/29/25  In re J.B. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re J.B. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. B.B., Appellant; J.B. et al., Minors and Appellants; S.A., Defendant and Respondent. | G064242 (Super. Ct. Nos. 20DP1317, 20DP1318) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Julie Anne Swain, Judge. Affirmed.

Rich Pfeiffer, under appointment by the Court of Appeal, for Appellant B.B.

William D. Caldwell, under appointment by the Court of Appeal, for Minors and Appellants.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Respondent S.A.

Leon J. Page, County Counsel, Debbie Torrez and Chloe R. Maksoudian, Deputy County Counsel, for Plaintiff and Respondent.

\*       \*       \*

Among other things, the dependency statutes prevent harm to children by allowing them to preserve emotionally important parental relationships through the parental-benefit exception to adoption. (*In re Caden C.* (2021) 11 Cal.5th 614, 643 (*Caden C.*).) The juvenile court in this case applied the parental-benefit exception codified at section 366.26, subdivision (c)(1)(B)(i) of the Welfare and Institutions Code[1] and selected guardianship rather than adoption as the permanent plan for J.B. and A.A., the two minor children of S.A. (Mother).

Appellants B.B. (J.B.'s paternal grandmother and the de facto parent and legal guardian of both J.B. and A.A.), J.B. and A.A., all appeal the court's order.[2] Appellants concede Mother satisfied the first two elements of

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] The Orange County Social Services Agency (the Agency) filed a letter brief joining the appellants' request to reverse the challenged order but has not separately appealed.

2

the parental-benefit exception set forth in *Caden C.*—i.e., regular and consistent visitation and the existence of a significant, emotional, and positive relationship between her and the children. Appellants contend, however, the juvenile court abused its discretion in weighing the third factor of the *Caden C.* analysis and concluding that terminating Mother's parental rights would be detrimental for J.B. and A.A., even when balanced against the benefit of a new adoptive home for them. We find no abuse of discretion in the court's decision to apply the parental-benefit exception and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

PROCEEDINGS PRIOR TO SECTION 366.26 HEARING[3]

When Mother tested positive for amphetamines after giving birth to A.A., the Agency requested, and the juvenile court issued, a protective custody warrant for the children. The Agency filed a child welfare petition under section 300, subdivisions (b)(1) (failure to protect) and (g) (no provision for support). At the detention hearing under section 319, subdivision (b), the juvenile court found a prima facie showing had been made that the children came within section 300 and that continuing them in Mother's care would be contrary to their welfare. Later, at a joint jurisdiction and disposition hearing, the court found the allegations of the amended petition true and declared the children dependents of the court. The court also found that vesting custody with Mother would be detrimental to the children. The court therefore ordered that custody of the children be vested with the Agency and

---

[3] We derive the facts in this section from our prior opinion. (*Orange County Social Services Agency v. S.A.* (Dec. 3, 2024, G063986) [nonpub. opn.].)

3

reasonable reunification services be provided to Mother and the children's respective presumed fathers.

After a combined 12- and 18-month review hearing, the juvenile court found Mother had made substantial progress toward alleviating or mitigating the reasons the children were removed, but it nevertheless found that returning the children to Mother "would create substantial risk of detriment to the [children's] safety, protection, or physical or emotional well-being." The court entered orders on May 17, 2023—one for each child—terminating reunification services and setting a section 366.26 hearing regarding termination of parental rights (permanency hearing).

II.

THE PERMANENCY HEARING UNDER SECTION 366.26

The permanency hearing took place over several days in May 2024. The parties submitted a stipulation regarding J.B.'s anticipated testimony, and the juvenile court heard live testimony from the social worker assigned by the Agency, Mother, and the licensed clinical psychologist appointed by the court to conduct a bonding study of Mother and the children (bonding expert). The court also received the bonding study prepared by the bonding expert and reports from the Agency.

Mother argued the parental benefit exception should apply. The guardian ad litem for the children, the Agency, and B.B. all argued against such a finding.

A. *Evidence Regarding the Children and Adoptability*

At the time of the permanency hearing, A.A. was three years old and J.B. was five years old, and the children had been in B.B.'s care for approximately two years in total (not counting two 60-day trial visits with

4

Mother). The children were happy and comfortable in their placement, and B.B. was committed to adopting both children.[4]

The social worker (who had been assigned to the case since February 2024) testified the children were generally and specifically adoptable. While acknowledging this was a difficult case because of a clear bond between the children and Mother, the Agency and social worker nonetheless recommended terminating parental rights and adoption as the permanent plan. Due to their ages, the Agency was unable to obtain the children's views about adoption and permanently separating from Mother. The parties did, however, submit to the juvenile court a stipulation that described what J.B. would testify to if he were called as a witness. The stipulation stated J.B. likes his visits with Mother, would like to continue having visits with Mother, would be sad if he did not see Mother again, likes seeing his maternal relatives, and would like to live with B.B., Mother, and his maternal grandmother.

B. *Visitation and Attachment Bond Between Mother and Children*

J.B. lived in the same home as Mother after his birth for approximately a year and a half. When A.A. was born, both children were removed from Mother. Mother's 19-year-old sister initially cared for the children for approximately eight months and supervised the children's visits with Mother. The children were then placed with B.B.

For approximately nine months leading up to the permanency hearing, Mother visited with the children 20 hours per week, supervised by Mother's relatives. Mother's visitation was consistent. Mother would spend

---

[4] J.B. called B.B. "mom" and A.A. called her "mommy" and "mama."

10 hours each Saturday and Sunday with the children. According to the Agency, "[d]uring visits, [Mother] devote[d] herself entirely to her role as a full-time mother." Mother and the children openly displayed affection to each other, and there were no observed worries or issues with the visitation. They also attended church together on Sundays. Maternal grandmother reported that Mother played appropriately with the children and disciplined them appropriately. Maternal grandmother stated the children got really sad during drop off time and would cling to Mother. On numerous occasions, J.B. asked to spend the night with Mother. A.A. would cry when visits were over. Maternal grandmother reported that it was not every time the children got sad at the end of visits, but it happened quite often.

According to the social worker who testified at the hearing, the children displayed a connection to Mother, held on to her, were eager to see her, and had a positive, strong attachment bond to Mother. The social worker believed the children would benefit from ongoing visitation with Mother and expressed concern that J.B. and A.A. could suffer abandonment issues and other detriment, including emotional instability, if Mother suddenly disappeared from their lives. She testified that therapy and a loving, stable home would be ways to address abandonment issues resulting from separation. When asked her opinion whether it would be better for the children to expose them to abandonment (and deal with it later through therapy) or to expose them to no abandonment at all, she testified it would be best not to expose them to abandonment at all. In the two visits she observed, the social worker saw no signs of distress on the part of the children when separating from Mother, although J.B. stated he wanted to stay with Mother.

Ultimately, the social worker said she believed the benefits of adoption would outweigh any detriment J.B. and A.A. would suffer and that

therapy would help them adjust. But when questioned on cross-examination why legal guardianship was not the recommendation in light of her opinion as to the potential detriment to the children resulting from an abrupt separation from Mother, the social worker responded she did not know.

The bonding expert reviewed multiple court reports, and interviewed the social worker, B.B., Mother, and both children. He also observed a visit between Mother and the children at a park the month before the permanency hearing. When Mother arrived for the visit, J.B. immediately recognized her car, began to run toward Mother, greeted her and "jumped into her for a hug." The bonding expert noted that prior to Mother arriving, J.B. stood up on the table twice and said "'Mama Mama'" and began looking around; J.B. was expecting to see his mother. A.A. saw Mother when she came into the playground. She stamped her feet with joy, greeted Mother, and hugged her. The children were very attentive to Mother during the visit; they listened to her and constantly asked for her attention. They enjoyed playing with Mother. When Mother left the visit at the bonding expert's request, J.B. kept looking for Mother and A.A. briefly cried, but was then not concerned. At the end of the visit, the children transitioned well back to B.B.'s care.

The bonding expert opined that both J.B. and A.A. had an "obvious" "substantial and positive bond" with Mother and would be detrimentally impacted if their relationship with Mother was abruptly and fully terminated. This was particularly true for J.B., who had lived with Mother for the first year and a half of his life. The bonding expert opined, however, that "in the long run," adoption would overcome the detriment the children would suffer from being separated from Mother, but he hoped for an

adoption "where they still had visitation with their mother." The bonding expert opined that J.B. and A.A. had secure attachments to B.B.

According to Mother, the children referred to her as "mama S[.] or mommy." J.B. was very attached to Mother. A.A. was also attached to Mother. Mother believed the children benefitted from their relationships with her. She believed the children would be hurt if the relationships were not maintained. On a few occasions when the children visited with her, J.B. stated he did not want to go back and would cry, saying he wanted to stay with Mother. She testified A.A. would throw tantrums at the time she was returning A.A. to B.B.

## C. *Juvenile Court's Ruling*

The juvenile court found by clear and convincing evidence the children were adoptable, but determined this was an exceptional case where termination of parental rights and adoption would not be in the best interests of the children. The court ordered legal guardianship to B.B. as the permanent plan.

The minor children and B.B. both filed timely appeals.

## DISCUSSION

## I.

## THE PARENTAL-BENEFIT EXCEPTION

Section 366.26's express purpose is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) If a juvenile court has decided to end reunification services, adoption is the legislative preference. (*Id.*, subd. (b)(1); see also *In re Celine R.* (2003) 31 Cal.4th 45, 53 [adoption gives children the best chance at a full emotional commitment from a responsible caretaker].) Accordingly, once the juvenile court finds the child is adoptable, "the court must order adoption and its necessary consequence,

8

termination of parental rights," unless a parent can establish one of the exceptions set forth in section 366.26, subdivision (c). (*In re Celine R., supra*, 31 Cal.4th at p. 53.) "At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Ibid.*)

The parental-benefit exception "allows a child a legal basis for maintaining a relationship with the child's parent if severing that relationship would, on balance, harm the child." (*Caden C., supra*, 11 Cal.5th at p. 643.) Put another way, "where terminating a child's substantial, positive attachment to the parent would, on balance, be detrimental to the child, that simply is a compelling reason not to terminate parental rights." (*Id.* at p. 636.) "The exception preserves the child's right to the relationship even when the child cannot safely live with that parent." (*Id.* at p. 643)

In *Caden C., supra*, 11 Cal.5th 614, the California Supreme Court "discern[ed] three elements the parent must prove" to establish the parental-benefit exception. (*Id.* at p. 631.) For the exception to apply, all three elements must be established by a preponderance of the evidence. (*Id.* at pp. 636–637.) First, the parent must show "regular visitation and contact with the child, taking into account the extent of visitation permitted." (*Id.* at p. 636.) This element is "straightforward," involving an assessment of whether the parent visits consistently. (*Id.* at p. 632.)

Second, the parent must show "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.) In assessing whether the child would

9

benefit from continuing the relationship with the parent, "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id*. at p. 632.) Thus, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid*.)

Third, the parent must show terminating the parent-child attachment "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C*., *supra*, 11 Cal.5th at p. 636.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id*. at p. 633.) This evaluation consists of a "subtle, case-specific inquiry[,]" including consideration of whether "the benefit of placement in a new, adoptive home" outweighs the harm the child "'would experience from the loss of [a] significant, positive, emotional relationship'" with the parent. (*Ibid*.) In making this detriment determination, the juvenile court does "not look to whether the parent can provide a home for the child," and "is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id*. at p. 634.)

## II.

### STANDARD OF REVIEW

In *Caden C*., *supra*, 11 Cal.5th 614, the Supreme Court clarified the standard of review applicable to a juvenile court's findings regarding the

10

parental-benefit exception. The first two elements—regular visitation and a beneficial relationship—involve determinations that are essentially factual and are reviewed for substantial evidence. (*Id.* at p. 640.) "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' [Citations.] Uncontradicted testimony rejected by the trial court "'cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved."'" (*Ibid.*)

The third element requires the juvenile court to determine whether any harm the child would suffer from the severance of the parental bond would outweigh the benefit to the child of adoption. (*Caden C., supra,* 11 Cal.5th at p. 640.) This requires a "hybrid" standard of review. (*Id.* at pp. 640–641.) As with the first two elements, the juvenile court must make a series of factual determinations, including determinations about the child's relationship with a parent, which we review for substantial evidence. (*Id.* at p. 640.) However, "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*)

Under the abuse of discretion standard, our role is to decide whether the juvenile court's decision exceeded the bounds of reason; in so doing, we cannot substitute our view for that of the juvenile court. (*Caden C., supra,* 11 Cal.5th at p. 641; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–

319.) Rather, "we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) "At its core, the hybrid standard we now endorse simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.'" (*Caden C., supra,* 11 Cal.5th at p. 641.)

A court abuses its discretion "'"by making an arbitrary, capricious, or patently absurd determination."'" (*Caden C., supra,* 11 Cal.5th at p. 641.) This highly deferential standard prevents us, as a reviewing court, from substituting our own judgment about what is in the child's best interests for the juvenile court's determination. (*Ibid.*) We reverse only if the evidence, viewed most favorably in support of the juvenile court's action, shows that no judge could reasonably have made the order that he or she did. (*Ibid.*)

### III.

### ANALYSIS

As they did below, appellants concede Mother met her burden on the first two elements of the *Caden C.* analysis. And we agree. Substantial evidence supports the juvenile court's findings in favor of Mother as to these two elements. Mother's visitation was regular and consistent, and the

children and Mother shared a substantial, positive, emotional bond such that the children would benefit from continuing their relationship with Mother.[5]

Appellants challenge only the juvenile court's determination on the third element of the parental-benefit exception, i.e., that "termination of parental rights would be detrimental [to the children]" and that the harm outweighs the benefit to the child of placement in a new adoptive home. (*Caden C., supra*, 11 Cal.5th at pp. 631–632.) Specifically, appellants argue this is not the extraordinary case where the juvenile court could deviate from adoption as the permanent plan for J.B. and A.A., who were ages five and three at the time of the permanency hearing and where the sole basis of the bond between the children and Mother was regular weekly visitation. They argue that any detriment to the children could be addressed through a post-termination visitation order, therapy, and the benefits of having a permanent and stable home with a loving caregiver.

Appellants rely on a recent case decided by another panel of this court, *In re Andrew M.* (2024) 102 Cal.App.5th 803 (*Andrew M.*). In that action, we reversed a juvenile court's order applying the parental-benefit exception, concluding the court's analysis of the third prong of the *Caden C.* test was conclusory and lacking and "offered little more than a bare recitation of the statutory requirements and did not satisfy the court's duty to 'state its reasons . . . on the record' for determining that the parental-benefit exception applied." (*Andrew M.* at p. 817.) In *Andrew M.*, the court noted the evidence of the bond between the parents and child in that case was not strong and

_____

[5] B.B. acknowledges in her appellate briefing that "[t]he evidence was sufficient to support the juvenile court's finding of the necessary substantial, positive, emotional attachment between the children and Mother."

13

held that in terms of detriment, parents "must prove some type of harm beyond the fact that their loving visits would cease." (*Id.* at p. 820.) The court emphasized, however, "[i]n appropriate cases, the strength of the relationship alone can support a finding that its termination would have a 'destabilizing' effect on the child." (*Ibid.*)

We conclude this is such a case. Here, the juvenile court considered all evidence before it, including the bonding expert's opinion (shared by the social worker) that the children had a strong bond with Mother, would be harmed by an abrupt separation from her that could only be mitigated "in the long run,"[6] and that J.B. and A.A. would best be served by continued visitation with her. Considering the substantial evidence of the strong bond between Mother and the children and the evidence of detriment to the children as a result of an abrupt termination of visitation, we find the juvenile court was well within the bounds of its discretion in applying the parental-benefit exception and find nothing arbitrary, capricious, or absurd in the court's decision. (*Caden C., supra*, 11 Cal.5th at p. 641.)

Unlike in *Andrew M.*, there is substantial evidence here that the bond between Mother and her children is strong—particularly J.B.'s attachment to Mother—as well as substantial evidence of the resulting detriment the children would suffer from an abrupt termination of that

---

[6] The social worker explained the children would suffer emotional instability and abandonment issues, and that it would be far better to avoid exposing children to such detriment than to expect therapy to remedy it.

14

relationship.[7] Notably, the juvenile court expressly found the visits between Mother and the children were not just playful, friend-like visits, but that Mother was actually mothering the children during their visits. In addition, there were multiple other factors present in *Andrew M.* that makes it materially distinguishable from this case. For instance, in *Andrew M.*, the juvenile court had improperly considered the child's relationship with members of the parents' broader family. (*Andrew M., supra,* 102 Cal.App.5th at pp. 817–818) Here, although J.B. and A.A. did have a relationship with the maternal relatives, the juvenile court did not consider it in evaluating their bond with Mother. In addition, the parents in *Andrew M.* missed multiple visits, arrived late to or left early from their visits, and by the month prior to the hearing, had reduced their visitation time to only four hours per week. (*Id.* at p. 811.) That is a far cry from this case, where Mother spent 10 hours per day on Saturdays and Sundays with the children and was regular and consistent in her visitation.

Although the parties conceded Mother met her burden on prongs one and two, the juvenile court nonetheless discussed the evidence in support of them because of their relevance to the ultimate balancing the court conducted in connection with the third element. The court considered all of

[7] In *Andrew M.*, the parents had a bonding study conducted but declined to submit it to the juvenile court at the permanency hearing. (*Andrew M., supra,* 102 Cal.App.5th at p. 812.) Andrew was two years old at the time of the permanency hearing, had never lived with his parents, and had always lived in the care of his foster parents, with whom he had developed a strong attachment bond. (*Id.* at p. 816.) "It [was] far from clear that the parents' interactions rose above pleasant visits and some emotional connection." (*Id.* at p. 817.) Here, in contrast, J.B. had lived with Mother for nearly two years of his life and suffered distress when separated from her. The bonding expert noted in his report that there is an "obvious bond" between Mother and the children.

the evidence before it, as well as the factors set forth in *In re Autumn H., supra,* 27 Cal.App.4th at page 576,[8] and it evaluated what it believed to be in the best interests of the children. Unlike in *Andrew M.*, the juvenile court here articulated its reasons for applying the parental-benefit exception.

In explaining its decision to apply the parental-benefit exception, the juvenile court clearly demonstrated its understanding of the applicable legal principles and its difficult role in weighing the evidence before it. For instance, the court noted that the question was whether *exceptional* circumstances necessitated the selection of a permanent plan other than adoption and specifically found that they were present here.

B.B. contends the juvenile court erred in assuming "adoption would require an abrupt end to visitation" and would terminate the juvenile court's ability to continue to exercise oversight over the case. B.B. argues the court could have considered a post-adoptive visitation agreement or order to mitigate the detriment to the children. We disagree. B.B. points to no legal authority that would allow a juvenile court to mandate visitation after adoption, and the law is to the contrary. "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights

---

[8] The juvenile court considered J.B.'s wishes consistent with his age. The court also considered the age of the children, the portion of their life spent with Mother, positive or negative interaction between Mother and the children, the children's needs, whether Mother is just beginning to address substance abuse or other issues, Mother's history of substance abuse or other issues that might contradict that the relationship is beneficial, and whether the visits are friendly, playful friend-like visits, or whether Mother is actually mothering. The court also considered "whether the parental relationship resembles a consistent, daily nurturing found in a positive, stable relationship."

terminates the relationship." (*Caden C., supra*, 11 Cal.5th at p. 633; see *In re C.B.* (2010) 190 Cal.App.4th 102, 128–129, and fn. 7 [prospective adoptive parents' willingness to allow the children to have continued contact with mother was an improper factor when considering whether to terminate parental rights]; *In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1391 [an order terminating parental rights "frees the child from all parental rights, custody or control, and does not sanction the maintenance of reasonable visitation"].)

In conclusion, based on the evidence, it was by no means unreasonable for the juvenile court to conclude that terminating Mother's parental rights would be detrimental to the children and that adoption would not outweigh this harm. We find no abuse of discretion.

## DISPOSITION

The order declining to terminate Mother's parental rights based on application of the parental-benefit exception and ordering legal guardianship as the permanent plan for the children is affirmed.


GOODING, J.

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.

17